1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10
11

IN RE: INFOSONICS CORPORATION
SECURITIES LITIGATION,

CASE NO. 06cv1231 BTM(WMc)

12

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS**

13
14
15

Defendants InfoSonics Corp., John J. Althoff ("Althoff"), Jeffrey Klausner ("Klausner"),

16

Joseph Murgo ("Murgo"), Joseph Ram ("Ram"), and Abraham G. Rosler ("Rosler")

17

(collectively "Defendants") have filed a motion to dismiss the Consolidated Amended Class

18

Action Complaint.  On July 25, 2007, the Court held oral argument on the motion.  For the

19

reasons discussed below, Defendants' motion is **GRANTED IN PART AND DENIED IN**

20

**PART**.

21
22

# I. BACKGROUND

23

Plaintiffs have filed suit on behalf of a purported class of purchasers of InfoSonics

24

securities between February 6, 2006 and August 9, 2006.

25

InfoSonics is a distributor of wireless handsets and accessories, providing cell phones

26

and other wireless products to carriers in both the United States and Latin America.

27

Defendant Ram is the founder of InfoSonics as well as its President, CEO, and a Director.

28

Althoff is President of InfoSonics' Latin American operations.  Klausner is InfoSonics' Chief

Financial Officer.  Murgo is InfoSonics' Vice President of North American Sales & Marketing.
Rosler is InfoSonics' Executive Vice President and a Director.

Plaintiffs claim that Defendants misled investors with respect to two issues: (1) the improper classification of warrants and the need to restate reported net income for the first quarter of 2006; and (2) an alleged "debacle" involving the sale of VK Mobile 530 phones to InfoSonics' largest U.S. customer, Centennial Wireless ("Centennial"), and its disastrous effect on U.S. sales.

With respect to the first issue, Plaintiffs allege that Defendants improperly delayed disclosing that InfoSonics had improperly accounted for warrants that had been issued in connection with the private placement of common stock.  The warrants were initially treated as a derivative liability.  On May 8, 2006, InfoSonics issued a press release announcing its financial results for the first quarter of 2006.  InfoSonics reported income from a non-cash change in fair value of the warrants.  InfoSonics reported net income of $1.738 million.

On June 12, 2006, InfoSonics revealed that it would need to restate its reported net income for the first quarter of 2006 of $1.738 million to $1.173 million because the Company had improperly treated the warrants as a derivative liability.  The Company learned that the warrants should have been reclassified as equity from February 17, 2006, the date upon which the SEC declared effective the Company's registration statement on Form S-3 registering the shares underlying the warrants.  InfoSonics' stock fell from a close of $24.22 on Friday, June 9, 2006 to a close of $17.38 on June 12, 2006.

Plaintiffs allege that Defendants knew about the improper classification of the warrants and the need to issue a restatement by May 22, 2006, when InfoSonics' auditors allegedly told Klausner that he had "screwed up" and that a restatement was necessary.  (Compl. ¶ 76.)  On May 31, 2006, InfoSonics announced a two-for-one stock split payable on June 19, 2006 to holders of record on June 9, 2006.  As a result of the announcement, shares of InfoSonics surged from $23.47 on May 30, 2006 to $33.53 on June 2, 2006.  Plaintiffs allege that although Defendants knew of the need to issue a restatement, Murgo, Rosler, Klausner and Althoff unloaded a total of $1.5 million of their personal holdings of InfoSonics stock.

06cv1231 BTM(WMc)

1   (Compl. ¶ 76.)

2       The second issue concerns an alleged "debacle" involving the sale of VK Mobile 530

3   phones to Centennial and the "derailment" of U.S. sales.  InfoSonics had entered into an

4   exclusive distribution agreement with VK Mobile.  According to Confidential Witness No. 1

5   ("CW1"), this exclusive relationship was supposed to be the "mother-lode" for InfoSonics that

6   would have allowed InfoSonics to compete against other distributors to Rural Service Area

7   carriers ("RSAs").  (Compl. ¶ 3.)  However, according to CW1, InfoSonics' and VK Mobile's

8   reputation amongst RSAs in the United States was soon ruined when InfoSonics' largest

9   RSA customer in the United States, Centennial, experienced repeated defects in connection

10  with an initial order of 50,000 VK phones in October 2005 and a subsequent order of VK

11  phones in January 2006.  (Compl. ¶ 5.)

12      According to CW1, the Centennial transaction was the "single largest VK Mobile sale"

13  in the United States, and was supposed to be the "big bite" that solidified the positions of

14  both InfoSonics and VK Mobile in the U.S. RSA market.  (Compl. ¶ 5.)  In October 2005,

15  Centennial placed a $6 million order for 50,000 VK 530 phones.  (Compl. ¶ 40.)  The first

16  shipment of 20,000 VK 530 phones were to be drop-shipped directly to 80-120 Centennial

17  locations in late October 2005.  (Compl. ¶ 72.c.)   The remaining 30,000 VK phones were

18  to be shipped to Centennial before the end of 2005.  (Id.)  Within days of the first shipment,

19  customers began reporting that the touch tone key pad lights would not go out.  (Id.)

20      In November 2005, InfoSonics arranged a "swap out" of the 20,000 VK 530 phones

21  with the help of VK Mobile.  (Compl. ¶ 72.c.)  However, within days of Centennial receiving

22  the new phones, customers reported that these phones were also defective.  (Compl. ¶

23  72.d.)  The problems were so serious that between December 2005 and February 2006,

24  Korean engineers sent by VK attempted to fix the issues.  (Compl. ¶ 72.e.)

25      In mid-January 2006, Murgo convinced Centennial that InfoSonics really "had a patch

26  this time around."  (Compl. ¶ 72.e.)  Centennial agreed to order 20,000 new phones in the

27  amount of $2 million – 10,000 of the phones were to be pink VK 530 phones delivered in

28  conjunction with Valentine's Day and Breast Cancer Awareness month and the other 10,000

were to be a new model called the VK 1000.  (Id.)   In order to entice Centennial to take this deal, InfoSonics offered to cancel the remaining 30,000 phones from the October 2005 purchase order and paid Centennial additional marketing development funds. (Id.)

InfoSonics shipped the pink VK 530 phones in late January to early February 2006. (Compl. ¶ 72.f.)  Within days, the same defect problems were reported.  (Id.)  According to CW1, before the end of February 2006, Centennial notified InfoSonics that it was pulling the VK phones off the shelves and returning all of the phones to InfoSonics.  (Id.)  InfoSonics offered to do another "swap-out" but Centennial would not return any of InfoSonics' daily calls or e-mails.  (Id.)  Around mid-March 2006, Centennial's Senior Vice President, Chuck Hollis, e-mailed Murgo and other senior executives at InfoSonics, stating that Centennial had been forced to institute a program with its customers whereby it exchanged all of the VK Mobile phones for "real phones" from another vendor.  (Compl. ¶ 72.g.)  Centennial indicated that it was returning all of the VK phones and would seek $1 million in damages.  (Id.)  By April 2006, InfoSonics had taken back all of the VK 530 phones shipped to Centennial.  (Id.)

According to CW1, the Centennial incident caused InfoSonics' and VK Mobile's reputation to suffer so much that InfoSonics' ability to sell in the North American market was derailed. (Compl. ¶¶ 5, 72.h.)  As a result, InfoSonics' U.S. revenues plummeted and never recovered.  (Id.)

Plaintiffs allege that as the Centennial debacle unfolded, Defendants concealed the problems with the VK 530 phone and continued to affirmatively represent that the product was "well received" and that they were excited about the growth opportunity for VK product in the United States.  Defendants also attributed the decline in U.S. sales in the first quarter of 2006 to manufacturing delays.

Plaintiffs allege that by concealing the truth about the Centennial transaction, Defendants artificially inflated the price of shares to the detriment of the Plaintiffs and to the benefit of Defendants who sold their personally-held InfoSonics common stock during the class period as follows: Ram sold 125,000 shares for total proceeds of approximately $1,459,000; Klausner sold 52,000 shares for total proceeds of approximately $799,000;

Althoff sold $35,000 shares for total proceeds of approximately $672,000; Murgo sold 55,000 shares for total proceeds of approximately $1,268,000; Rosler sold 90,000 for total proceeds of approximately $1,044,000.  (Compl., ¶¶ 18-22.)

On August 9, 2006, InfoSonics announced its financial results for the second quarter of 2006.  It was revealed that U.S. sales had again declined dramatically, with only 6% of InfoSoncis' revenue coming from U.S. sales.  (Compl., ¶ 66.)  Shares of InfoSonics fell more than 26% from a close of $8.51 on August 9, 2006 to a close of $6.25 on August 10, 2006, on more than four times the average trading volume.  (Id.)  InfoSonics' stock price has never recovered.  (Id.)

The Consolidated Amended Class Action Complaint asserts causes of action for   (1) violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, (2) violation of section 20(a) of the Exchange Act, 15 U.S.C. § 78t, and (3) violation of section 20A of the Exchange Act.

## II. DISCUSSION

### A.     PSLRA Pleading Standards

A securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, the complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).   Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002).

The required state of mind is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12 (1976).  The plaintiff must "state facts giving rise to a strong inference of deliberate recklessness or intent.  It is not enough . . . to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness." In re Silicon

1   Graphics Inc. Sec. Litig., 183 F.3d 970, 985 (1999).  Courts "should consider all the

2   allegations in their entirety, together with any reasonable inferences that can be drawn

3   therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the

4   requisite inference of scienter." Gompper, 298 F.3d at 897.

5        In a recent case, the Supreme Court clarified that in determining whether the pleaded

6   facts give rise to a "strong" inference of scienter, the court "must take into account plausible

7   opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, 127 S. Ct.

8   2499, 2509 (2007).  The Supreme Court explained that the strength of an inference depends

9   on its particular context:  "To determine whether the plaintiff has alleged facts that give rise

10  to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable

11  explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at

12  2510.   A complaint will survive a motion to dismiss under the PSLRA "only if a reasonable

13  person would deem the inference of scienter cogent and at least as compelling as any

14  opposing inference one could draw from the facts alleged." Id.

15

16  **B.    Analysis**

17        **1.   The Warrants**

18        Plaintiffs allege that Defendants delayed revealing that the warrants were

19  misclassified.   According to CW2, within two weeks of InfoSonics' May 8, 2006

20  announcement of the financial results for the first quarter of 2006, "InfoSonics' auditors told

21  Defendant Klausner that InfoSonics had 'screwed up,' and that Defendant Klausner had

22  caused the Company to account for the warrants inappropriately, and that InfoSonics would

23  need to restate its 1Q06 financial statements." (Compl. ¶ 76.)  However, the Company did

24  not disclose the need to restate its reported net income for 1Q06 until June 12, 2006.  (Id.)

25        Defendants argue that the Complaint fails to state with particularity facts giving rise

26  to a strong inference of scienter.  The Court agrees for two reasons.

27        First, the Complaint does not allege sufficient facts establishing that Klausner knew

28  about the misclassification of the warrants by May 22, 2006.  The fact that the source of the

1   information is confidential is irrelevant.  What matters is that the source does not state *how*

2   he or she knows that auditors spoke with Klausner about the misclassification of the

3   warrants.  CW2 does not claim that he or she participated in the conversation, nor does CW2

4   claim that a party to the conversation relayed the information to him/her.  CW2's "knowledge"

5   regarding the alleged conversation between the auditors and Klausner could be based on

6   rumor or speculation.

7       Second, even assuming that Klausner was informed about the misclassification by

8   May 22, 2006, the pleaded facts do not give rise to a strong inference of scienter.  If Klausner

9   learned about the misclassification of the warrants by May 22, 2006, only three weeks or a

10  little longer passed before the actual restatement was issued.   There are no factual

11  allegations regarding when Klausner raised the issue of the warrants with Ram and/or

12  whoever else needed to know.  It is possible that he told the appropriate people right away

13  and promptly carried out his duty to initiate an investigation into the matter.

14      As for the other defendants, once they learned about the issue, they would have to

15  verify that a restatement was necessary after careful consideration and consultation with

16  independent accountants and/or other experts.  According to the Form 8K filed on June 12,

17  2006, InfoSonics determined that a restatement of its Quarterly Report for the First Quarter

18  of 2006 was necessary on June 5, 2006 – two weeks or so after Klausner was allegedly

19  informed about the misclassification.  (Plaintiffs Request for Judicial Notice, Exh. C.)  Two

20  weeks is not such a long period of time that it, alone, would support a strong inference of

21  scienter.

22      Plaintiffs argue that under SEC regulations, InfoSonics was required to file the Form

23  8K within four business days, which would have been June 9, 2006.  However, even if the

24  Form should have been filed on Friday, June 9, 2006, there is no showing that Plaintiffs

25  suffered harm from the fact that the Form was not filed until the next business day.[1]

26  

27      [1] Exhibits filed in conjunction with the Reply show that the Form 8-K and amended
28  Form 10-Q were actually submitted on June 9, 2006 just before 8:00 p.m. but were deemed
    filed on June 12, 2006.  Defendants also argue that the four-business-day period did not
    begin until their accounting firm concurred with the reclassification on June 9, 2006.

1    Plaintiffs rely heavily on the fact that Klausner sold shares on June 5, 2006, and

2    Althoff sold shares on June 7, 2006.  Plaintiffs allege that these sales, which took place *after*

3    InfoSonics determined the need to reclassify the warrants, clearly violated the "abstain or

4    disclose" rule and violated Rule 10b-5.  "[M]otive can be a relevant consideration, and

5    personal financial gain may weigh heavily in favor of a scienter inference . . . ." Tellabs, 127

6    S.Ct. at 2511.  However, looking at all of the facts, Klausner and Althoff's June sales are not

7    convincing evidence of improper motive.  Insider trading is suspicious only when it is

8    "dramatically out of line with prior trading practices at times calculated to maximize the

9    personal benefit from undisclosed inside information." In re Apple Computer Sec. Litig., 886

10   F.2d 1109, 1117 (9th Cir. 1989).    Klausner and Althoff's June sales were pre-scheduled

11   under Rule 10b-5 trading plans that were already in place.  (Def.'s Exhs. N, O.)[2]  In order to

12   prevent the sales, Klausner and Althoff would have had to terminate the trading plans and

13   then would be vulnerable to accusations that they terminated the plans to avoid selling

14   shares at lower prices after the restatement.   Klausner continued to sell shares in

15   accordance with the 10b-5 plan even after InfoSonics' announcement of its financial results

16   for the second quarter of 2006.

17   Plaintiffs' argument that Defendants delayed issuing the restatement so that their

18   prescheduled sale of stock would be at higher prices is undermined by the fact that the

19   restatement was issued *before* the prescheduled June sales under Ram and Murgo's 10b-5

20   plans.  The announcement of the restatement was made on June 12, 2006, before the

21   markets opened for trading, even though Murgo's plan required him to sell 15,000 shares

22   that day. (Def.'s Exh. Q.) Ram was scheduled to sell shares on June 19, 2006. (Def.'s Exh.

23   M.)

24   Perhaps Defendants could have issued the restatement with more alacrity.  However,

25

26    [2]  The Court takes judicial notice of the Forms 4 and considers them under the
incorporation by reference doctrine.  See Tellabs, 127 S.Ct. at 2509; Branch v. Tunnell, 14
27   F.3d 449, 454 (9th Cir. 1994); Janas v. McCracken (In re Silicon Graphics Inc., Sec. Litig.),
183 F.3d 970, 986 (9th Cir. 1999). Plaintiffs discuss Defendants' stock trades and must have
28   relied on the SEC filings.  The Court also takes judicial notice of the other SEC filings and
press releases submitted by Defendants.

06cv1231 BTM(WMc)

1   given that InfoSonics' review of the classification of the warrants was voluntary and that only

2   a few weeks passed between the time Klausner was allegedly told of the misclassification

3   and the issuance of the  restatement, any delay does not support a "cogent and compelling"

4   inference of scienter.

5        Therefore, the Court grants the motion to dismiss Plaintiffs' claims to the extent they

6   are based on the alleged delay in restating the net income for the first quarter of 2006.

7   However, the Court grants Plaintiffs leave to amend the Complaint to correct the deficiencies

8   identified above.

9

10      **2.  VK Mobile**

11       Plaintiffs allege that Defendants' failure to disclose the Centennial "debacle" rendered

12  false and misleading their statements regarding the success of the VK Mobile phones and

13  the reason for the decline in U.S. sales in the first quarter of 2006.  The allegedly false and

14  misleading statements are examined individually below.

15

16      **a.  February 6, 2006 Press Release**

17

18       On February 6, 2006, InfoSonics issued a press release announcing that it had
    "extended its exclusive distribution agreement with VK Mobile through April 2007." The press
    release also quoted Ram's statement that "[t]he extension of this exclusive arrangement with
19  VK Mobile should enable us to build upon the initial success we have had in working very
    closely with VK's management and executive team. . . . **The initial VK products have been**
20  **well received by the consumer both in United States and Latin America**." (Emphasis
    added).
21

22       Defendants argue that Ram's statement regarding the VK products having been "well

23  received" was vague puffery and is not actionable.  In addition, Defendants argue that VK

24  Mobile phones were sold to domestic carriers other than Centennial and to carriers in Latin

25  America.  Defendants further argue  that record VK Mobile phone sales throughout 2005 and

26  early 2006, leading to the extension of InfoSonics' distribution agreement with VK Mobile, are

27  evidence of the statement's accuracy.

28       The Court rejects Defendants' argument that Ram's statement constitutes "puffery."

9

1   "Puffery" consists of vague and unspecific assertions upon which a reasonable consumer

2   could not rely.  See Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir.

3   2003).  This statement, though general, relays information that is tied to verifiable facts.  In

4   addition, it would not be unreasonable for an investor to rely on this information regarding

5   past performance of the VK products in making investment decisions.

6        According to CW1, a former high level Account Manager with InfoSonics' North

7   American operations, InfoSonics considered the Centennial transaction to be the "big bite"

8   that would solidify InfoSonics' position in the domestic  RSA market.  (Compl. ¶ 72.b.)  The

9   Centennial deal was the single largest VK mobile sale ever in the U.S., and the single largest

10  U.S. sale in InfoSonics' history.  (Id.)  The magnitude of the initial $6 million Centennial order

11  is  demonstrated  by  the  fact  that  InfoSonics  reported  only  $35  million  in  total  sales

12  internationally and domestically for the fourth quarter of 2005.  (Id.)

13       By the time of the press release, according to CW1, both the initial shipment of 20,000

14  phones and the replacement shipment of 20,000 (authorized by Murgo and Ram) had been

15  plagued with defects.  (Compl. ¶ 72.c., d.)  Customers reported problems with the touch tone

16  key pads and multi-messaging capabilities.  Centennial VP Chuck Hollis was angry about the

17  defective phones and in an e-mail to Murgo demanded that InfoSonics "figure this [the issue]

18  out and figure it out right now."  (Compl. ¶ 72.d.)  The defects were so serious that VK sent

19  Korean engineers to try to fix the problem with the second shipment.  (Compl. ¶ 72.e.)

20       The factual allegations set forth above support the conclusion that the representation

21  that initial VK products had been well-received by consumers in the United States was

22  misleading.  The fact that initial sales may have been promising or that InfoSonics was willing

23  to extend its distribution agreement with VK Mobile does not contradict Plaintiffs' claim that

24  there had been a significant number of complaints regarding problems with VK 530 phones

25  shipped to Centennial, leading to a swap-out of the initial 20,000 phones and continuing

26  efforts to remedy the problems.

27       Defendants argue that the Complaint lacks particularized facts demonstrating a basis

28  on which to infer the accuracy of CW1's knowledge.  As explained by the Ninth Circuit,

"Naming sources is unnecessary so long as the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'" In re Daou Systems, Inc., 411 F.3d 1006, 1015 (9th Cir. 2005) (citing Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004)). Here, Plaintiffs have alleged enough to conclude that CW1 occupied a position that provided him with access to information regarding the problems with the VK 530 phones shipped to Centennial. The Complaint states :

> Confidential Witness No. 1 ("CW1") is a former high level Account Manager with InfoSonics' North American operations who worked at the Company before and during the events at issue in the Class period. CW1 has personal knowledge of, inter alia, the Centennial transaction involving the defective VK 530 mobile phones described herein, InfoSonics' inadequate response to that situation, and generally InfoSonics' sales in the U.S.

(Compl. ¶ 31.) In light of the small size of the company (fewer than 30 people), a high-level employee in sales would be in a position to know about the problems plaguing InfoSonics' relationship with its biggest U.S. customer. Furthermore, CW1 provides detailed information regarding the problems that were reported and how InfoSonics responded.

The pleaded facts give rise to a strong inference of scienter on the part of Ram and Murgo. At the time of the press release, Ram and Murgo allegedly knew that U.S. customers had reported problems in connection with the initial shipment of VK 530 phones and the swap-out phones. Nevertheless, the press release made the false blanket statement that the initial VK product was "well received" by the consumer in the United States as well as Latin America.

Although the challenged statement was made by Ram, Murgo can be held liable because Plaintiffs allege that the defendant officers were involved in the drafting, producing, reviewing and/or disseminating of the Company's public filings, press releases, and other publications. (Compl. ¶ 24.) Plaintiffs further allege that each of the defendant officers "by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-today [sic] operations of the company at the highest levels and was privy to confidential proprietary information concerning the Company

11

1   and its business ,operations, growth, financial statements, and financial condition, as alleged

2   here." (Id.)

3        Defendants argue that the "group published doctrine" does not survive the PSLRA.

4   Under the "group published doctrine," "where the false and misleading information is

5   conveyed in prospectuses, registration statements, annual reports, press release, or other

6   'group published information,' it is reasonable to presume that these are the collective actions

7   of the officers."   In re GlenFed Sec. Litig., 60 F.3d 591, 593 (9th Cir. 1995).   The "group

8   published doctrine" is generally applied to narrowly defined groups of officers who have direct

9   involvement and control over the day-to-day affairs. See, e.g., Wool v. Tandem Computers,

10   Inc., 818 F.2d 1433, 1440 (9th Cir. 1987);   Blake v. Dierdorff, 856 F.2d 1365, 1369 (9th Cir.

11   1988).

12        Other Circuits have held that the group published doctrine is inconsistent with the

13   PSLRA's pleading requirements and does not survive.   See, e.g., Southland Sec. Corp. v.

14   Inspire Insurance Solutions Inc., 365 F.3d 353 (5th Cir. 2004); Makor Issues & Rights, Ltd.,

15   v. Tellabs, Inc., 437 F.3d 588 (7th Cir. 2006).  However, the Ninth Circuit has not yet spoken

16   on the issue.

17        The Court need not reach the issue of whether the "group published doctrine" survives

18   the PSLRA.  The Court does not apply a "presumption" to conclude that Murgo can be held

19   liable for Ram's statement contained in the press release.  Rather, the Court finds that *under*

20   *the specific facts of this case*, the allegations of the Complaint are sufficient to attribute the

21   challenged statement to Murgo as well as defendants Klausner and Rosler.[3]  The allegations

22   that Ram, Rosler, Klausner, and Murgo were directly involved in the day-to-day operations

23   of the Company and were involved in drafting, reviewing, and issuing press releases and

24   other public documents, are supported by the facts that these defendants are a select group

25   of officers and InfoSonics is a small Company with less than 30 employees.

26        In contrast, the allegations are insufficient to hold defendant Althoff liable for

27

---

28        [3] Although Ram's statement can be attributed to Klausner and Rosler, the pleaded facts do no establish that Klausner and Rosler knew about the problems with the Centennial transaction at the time of the February 6, 2006 press release.

      06cv1231 BTM(WMc)

statements made in InfoSonics' press releases, SEC filings, and other public documents. Althoff is President of InfoSonics' Latin American operations. There are no allegations linking Althoff to the domestic side of InfoSonics' business. Therefore, the Complaint is dismissed without prejudice as to Althoff. Plaintiffs may amend their Complaint to add further allegations regarding Althoff's involvement in InfoSonics' domestic operations.

In sum, the Complaint pleads with sufficient particularity the falsity of Ram's statement in the February 6, 2006 press release and scienter on the part of Ram and Murgo.

#### b.   March 8, 2006 Conference Call

On March 8, 2006, InfoSonics reported "record-breaking financial performance" for its fiscal year 2005. InfoSonics held a conference call that day with analysts to discuss the results. During the call, Defendant Ram reiterated that InfoSonics' relationship with VK Mobile and the VK 530 were key components of InfoSonics' success, stating:

> In 2005, InfoSonics continued to successfully deliver on its strategy by enhancing our product offering, further developing long-term or stick relationships with our manufacture and share partners and expanding the company's global footprint both domestically and in Latin America while at the same time increasing profitability and value for our shareholders. **Our strong business foundation built upon quality services, knowledge of the market trends and understanding of customer needs have enabled us to achieve several important milestones with our two main vendor partners, Samsung and VK Mobile**.
>
> * * *
>
> **We entered into agreement with our second primary manufacturer VK Mobile in 2004 and we are very pleased with the results that we have achieved in 2005.** The first VK product, the VK 530 clamshell phone began shipping in late in the first quarter of last year after being approved by several domestic and international carriers in Guatemala, El Salvador, Mexico, Nicaragua, and in the United States.
>
> **Due to the strong demand of this phone sales of VK product grew in the fourth quarter. We continue to be very excited about the growth opportunity for VK product both in the U.S.** and in Latin America. In 2006 we expect to launch and gain approval for at least three new VK handset including the VK2000 and VK1000 series phones. We've already began the regulatory process to get approval for the sale of the newly acclaimed VK200 handset.
>
> **The success that we've had with VK Mobile and the strong partnership that we build led to the extension of an**

**exclusive agreement of distributed handsets both GSM and CMDA offering in North America**, Central and South America and the Caribbean region through April 2007. Additionally we were able to expand the same agreement to also include Canada.

\* \* \*

As I mentioned our goal for 2006 is to introduce a minimum of three VK Mobile phones with plans where we expect to launch several new handsets to the marketplace both in the U.S. and in Latin America. With the addition of i-mate and other handset we plan to introduce from both Samsung, VK Mobile we believe that we have a comprehensive slate of products across both mid-tier and high-tier products.

\* \* \*

**We will also continue to further penetrate the U.S. market. We believe that the VK Mobile handset can be competitive against major manufacturers and we will to continue to market VK products to the U.S. carriers.** (Emphasis added).

Defendant Klausner further highlighted the importance of the VK Mobile and the VK 530 phone, stating that "[t]he **improvement in gross margin is attributable to** the sales of more value-added services and solutions which are included in the products sold during the fourth quarter of 2005, in addition to a more favorable product and geographic mix, specifically **the increase in sales of the VK Mobile 530 clamshell phone**."

Several of the statements in the conference call are too unspecific to be actionable. Ram's statements that InfoSonics achieved "important milestones" with Samsung and VK Mobile and that InfoSonics was "pleased with the results that we have achieved in 2005," lack specificity and do not convey any meaningful information upon which an investor would rely.   It is unclear what "milestones" or "results" InfoSonics is referring to.  Although there were problems with the product delivered to Centennial, there were record sales in the last quarter of 2005.   Furthermore, the "milestones" and "results" encompass InfoSonics' business activity in the international market.  The statement regarding the "success that we've had with VK Mobile" leading to the extension of the exclusive agreement through April 2007, is similarly vague.  There must have been some degree of success in the partnership between InfoSonics and VK Mobile because in or about February 2006, InfoSonics did in fact extend the exclusive agreement.

Ram's statements regarding the future market for VK products in the United States are more troubling.  Ram mentioned the "strong demand" of the VK 530 in the fourth quarter and said that the Company continued to be very excited about the "growth opportunity" for

14

1   VK product both in the U.S. and Latin America.  Ram also stated that InfoSonics would

2   continue to "further penetrate" the U.S. market and that the Company believed that the VK

3   Mobile handset "can be competitive against major manufacturers."

4       Defendants argue that Ram's statements were forward-looking statements of

5   corporate optimism.  However,  projections and general expressions of optimism are

6   actionable if (1) the statement is not genuinely believed; (2) there is no reasonable basis for

7   the belief; or (3) the speaker is aware of undisclosed facts tending to seriously undermine

8   the accuracy of the statement.  In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th

9   Cir. 1989).

10      The allegations of the Complaint give rise to a strong inference that there was no

11  reasonable basis for Ram to believe that there was growth potential for VK product in the

12  domestic market. According to CW1, by the time of this conference call, the Centennial

13  transaction had deteriorated into an unmitigated disaster.  Not only were there problems with

14  the initial shipment of 20,000 phones and the swap-out shipment of 20,000 phones, there

15  were also defects reported with respect to the 10,000 pink VK 530 phones shipped in late

16  January and early February.  According to CW1, before the end of February 2006,

17  Centennial notified InfoSonics that it was pulling the VK phones off the shelves and returning

18  all of the phones to InfoSonics.

19      CW1 explains that "the Centennial incident – which was supposed to solidify

20  InfoSonics' position in the U.S. RSA market – caused InfoSonics' and VK Mobile's reputation

21  to suffer so much so that InfoSonics' ability to sell into the North American market was

22  'derailed.'" (Compl. ¶ 72.h.)   Other customers referred to the VK Mobile phones as "VK

23  crap." (Id.)  CW1 claims that by the end of February 2006, the Centennial debacle was

24  "public knowledge" at InfoSonics.  (Compl. ¶ 72.f.)

25      As discussed above, the Complaint's allegations are sufficient to conclude that CW1

26  occupied a position that provided him with access to information regarding the problems with

27  the Centennial transaction.  The allegations are also sufficient to conclude that CW1, a high

28  level Account Manager, would have knowledge of InfoSonics' reputation with its customers

1    and how its reputation was affected by the Centennial "debacle."

2          Given the small size of InfoSonics, the significance of the relationship with Centennial,

3    and the disastrous sequence of events that led to the end of the relationship, CW1's claim

4    that the information was "public knowledge" within the Company is credible.  Accepting

5    CW1's statements as true, at the time of the conference call, Ram would have known that

6    InfoSonics had lost its largest U.S. customer and had suffered a serious blow to its

7    reputation, rendering his statements regarding future growth in the domestic market false and

8    misleading.[4]

9          On the other hand, Plaintiffs have failed to establish the falsity of Klausner's statement

10   that the improvement in gross margin was attributable to the sales of more value-added

11   services and solutions included in the products sold during the fourth quarter of 2005,

12   specifically the increase in sales of the VK Mobile 530 clamshell phone.  Klausner's

13   statement, viewed by itself, does not concern future sales of VK Mobile phones, but, rather,

14   is limited to historical facts regarding domestic and international sales of products, including

15   the VK 530 phone.  Whether Klausner's statement, when viewed in context (which is not

16   before the Court), implied something more is unknown to the Court.

17         Based on the allegations of the Complaint, only Ram can be held liable for the

18   statements he made during the conference call.  Some courts have held that a high-ranking

19   company official cannot knowingly fail to correct a false oral statement made by another

20   official at a conference with analysts or similar setting.  See Barrie v. Intervoice-Brite, Inc.,

21   _____

22   [4] In their Memorandum of Points and Authorities, Defendants indicate in a footnote
     that the Company's press release of February 6, 2006, included the following  "safe harbor

23   language": "The forward-looking statements contained herein are subject to certain risk and
     uncertainties that could cause actual results to differ materially from those reflected in the

24   forward-looking statements.  Some of these uncertainties and risks include, but are not
     limited to, the demand for our products, our ability to obtain our products from our suppliers,
     our ability to increase customers in new and existing geographic areas, our ability to maintain

25   commercially feasible margins given significant competition, and other factors . . . Readers
     are cautioned not to place undue reliance on these forward-looking statements, which reflect

26   management's analysis only as of the date hereof." Even assuming this cautionary language
     applies to future statements, such as those made by Ram during the conference call, the

27   language does not contain "meaningful cautionary statements" as required by  15 U.S.C. §
     78u-5(c)(1)(A).  The language does not reveal that Defendants already knew that InfoSonics

28   had lost its biggest U.S. customer and that its reputation amongst the RSAs had been
     damaged.

06cv1231 BTM(WMc)

409 F.3d 653 (5th Cir. 2005); In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 543 (D. Ohio 2000).  However, Plaintiffs need to *plead* that the official failed to correct the statements of another.  See Barrie, 409 F.3d at 656.   Plaintiffs have not specifically made such allegations.

### c.   Form 10K (filed March 31, 2006)

In the Form 10K filed for the year ended December 31, 2005, InfoSonics stated that its "strategy" included "**further penetrate[ing] our existing markets** in . . . rural service areas in the United States, **which we believe will enable us to increase sales** by introducing products from certain of our manufacturer suppliers that have not been previously sold into these markets."

This statement can be attributed to Ram, Klausner, Rosler, and Murgo for the reasons discussed in Section II.B.2.a., supra.  Falsity and scienter have been pled with sufficient particularity because, as discussed in Section II.B.2.b, supra, Defendants allegedly knew that there would be no increase in sales in the United States, but, rather, would be a precipitous drop in sales due to the loss of Centennial as a customer and the damage to InfoSonics' reputation among RSAs.

### d.   May 8, 2006 Conference Call & Form 10-Q

During a conference call on May 8, 2006, Ram stated, among other things, "**We continue to be very excited about the growth opportunity for VK Mobile line of products both in the U.S.** and throughout Latin America."  (Emphasis added.)

Ram also commented on the decline in U.S. sales, stating:

As management we are disappointed in our domestic sales results. **The reduction in sales in the U.S. is directly attributed to product launch cycle. Due to manufacturing delay we were unable to launch several new models that were slated to launch during the quarter**. As management, we are focused on this challenge and we're taking corrective plans to accelerate product introduction in this market and target new customers. (Emphasis added.)

In the Form 10-Q filed for the first quarter of 2006, under Management's Discussion and Analysis of Operations and Financial Condition, Defendants said nothing about the Centennial debacle and stated that:

**Company Specific Trends, Challenges, Risks and Growth Opportunities**

During the quarter ended March 31, 2006, **due to delayed introductions and**

17

**longer than expected approval certifications processes for certain products in the U.S.**, we were unable to procure and deliver product to meet the needs of our U.S. customers.  (Emphasis added.)

In Exhibits 31.1-31.2 dated May 15, 2006 to the Form 10-Q, Defendants Ram and Klausner certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, *inter alia*, that "this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."

As discussed above, according to CW1, the Centennial "debacle" caused "a complete loss of faith" in the VK Mobile product amongst the RSAs and derailed U.S. sales.  The allegations of the Complaint give rise to a strong inference that Defendants Ram, Klausner, Murgo, and Rosler knew about the disastrous Centennial transaction and the adverse effects it had on other U.S. sales.  Thus, it was materially misleading to indicate that InfoSonics was still excited about "growth opportunity," remain silent about the disastrous effect of the Centennial situation, and attribute the decline in domestic sales to manufacturing delays - a temporary problem.

Defendants argue that the Complaint confirms that there were in fact manufacturing delays.  *See* Compl. ¶ 72.i.  However, it is clear from the allegations of the Complaint, that the primary reason for the "derailment" of U.S. sales was not temporary manufacturing delays, but, rather, the Centennial "debacle" and the loss of confidence in VK product amongst the RSAs.  Thus, Defendants' statements that the decline in domestic sales was the result of manufacturing delays, a remediable problem, were false and misleading.

### e.    Loss Causation

Defendants argue that Plaintiffs have not demonstrated loss causation because Plaintiffs have not established a causal connection between any of the alleged misleading statements and their purported losses.  Specifically, Defendants argue that Plaintiffs fail to allege that the truth regarding the "systemic defects" of the VK530 phones was ever revealed.  Therefore, Defendants argue, Plaintiffs cannot show how the allegedly false or misleading statements constitute a proximate or legal cause of their loss.

1    Defendants have an overly restrictive view of the requirements for proving loss

2 causation.  To prove loss causation, the plaintiff must "demonstrate a causal connection

3 between the deceptive acts that form the basis for the claim of securities fraud and the injury

4 suffered by plaintiff."  In re Daou Systems, Inc., 411 F.3d 1006, 1025 (9th Cir. 2005).  There

5 does not seem to be a requirement that the specific reasons why the statements at issue

6 were false or misleading come to light, only that the "facts . . . become generally known."

7 Dura Pharm, Inc. v. Broudo, 544 U.S. 336 (2005) (quoting Restatement of Torts § 548A,

8 Comment b).

9    Here, the pertinent facts that became known to the public were that Infosonics was

10 suffering serious problems with U.S. sales that could not be attributed to a temporary

11 manufacturing delay, as represented in the First Quarter 2006 financial results.  Plaintiffs

12 claim that stock prices were artificially inflated because the public believed that the VK

13 phones were successful products, that sales were going well, and that any dip in sales was

14 due to temporary manufacturing delays.  According to Plaintiffs, when the second quarter

15 financial results came out, InfoSonics could not conceal the fact that U.S. sales were in

16 genuine trouble.  Upon the revelation of this news, InfoSonics stock fell 26%.

17    Plaintiffs have sufficiently pled loss causation.

18

19                      **III.  CONCLUSION**

20    For the reasons discussed above, Defendants' motion to dismiss is **GRANTED IN**

21 **PART AND DENIED IN PART**.  Plaintiffs' claims are **DISMISSED WITHOUT PREJUDICE**

22 to the extent they are based on (1) an alleged delay in issuing a restatement of its net income

23 for the first quarter of 2006; and (2) Klausner's statement during the March 8, 2006

24 conference call. Plaintiffs claims are also **DISMISSED WITHOUT PREJUDICE** as to

25 defendant Althoff.

26    Plaintiffs claims are **DISMISSED WITH PREJUDICE** to the extent they are based on

27 Ram's statements during the March 8, 2006 conference call regarding the achievement of

28 "several important milestones," being "pleased with the results that we have achieved in

19

1   2005," and "the success that we've had with VK Mobile" leading to the extension of the
2   exclusive distribution agreement.

3       Plaintiffs may file a Second Amended Class Action Complaint correcting the
4   deficiencies noted above on or before **September 10, 2007**.  Plaintiffs shall lodge with
5   Chambers a redlined version of the Second Amended Class Action Complaint, which
6   identifies any additions and deletions.  Any motion to dismiss the Second Amended Class
7   Action Complaint shall be filed on or before **October 1, 2007** and shall be limited to 10
8   pages.  The opposition shall also be limited to 10 pages, and the reply shall be limited to 5
9   pages.

11  DATED:  August 7, 2007

Honorable Barry Ted Moskowitz
United States District Judge

06cv1231 BTM(WMc)